Stacey Geis, CA Bar No. 181444
Earthjustice
50 California St., Suite 500
San Francisco, CA 94111-4608
Phone: (415) 217-2000
Fax: (415) 217-2040
sgeis@earthjustice.org
*Local Counsel for Plaintiffs Sierra Club et al.*
*(Additional Counsel Listed on Signature Page)*

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| SIERRA CLUB; LOS PADRES FORESTWATCH; CENTER FOR BIOLOGICAL DIVERSITY; EARTHWORKS; ENVIRONMENTAL DEFENSE FUND; NATURAL RESOURCES DEFENSE COUNCIL; THE WILDERNESS SOCIETY; NATIONAL WILDLIFE FEDERATION; CITIZENS FOR A HEALTHY COMMUNITY; DINÉ CITIZENS AGAINST RUINING OUR ENVIRONMENT; ENVIRONMENTAL LAW AND POLICY CENTER; FORT BERTHOLD PROTECTORS OF WATER AND EARTH RIGHTS; MONTANA ENVIRONMENTAL INFORMATION CENTER; SAN JUAN CITIZENS ALLIANCE; WESTERN ORGANIZATION OF RESOURCE COUNCILS; WILDERNESS WORKSHOP; WILDEARTH GUARDIANS; and WYOMING OUTDOOR COUNCIL, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) Case No. 3:18-cv-5984 |
| Plaintiffs, | ) ) ) **COMPLAINT FOR DECLARATORY** ) **AND INJUNCTIVE RELIEF** ) ) (Administrative Procedure Act, ) 5 U.S.C. § 551, *et seq.*) |
| v. | ) ) |
| RYAN ZINKE, in his official capacity as Secretary of the Interior; BUREAU OF LAND MANAGEMENT; and UNITED STATES DEPARTMENT OF THE INTERIOR, | ) ) ) ) ) ) |
| Defendants. | ) |

Complaint for Declaratory and Injunctive Relief
Case No. 3:18-cv-5984

**INTRODUCTION**

1.      This case challenges the U.S. Bureau of Land Management's (BLM) final rule, 83 Fed. Reg. 49,184 (Sept. 28, 2018) (Rescission Rule), rescinding almost all provisions of the Waste Prevention, Production Subject to Royalties, and Resource Conservation Rule, 81 Fed. Reg. 83,008 (Nov. 18, 2016) (Waste Prevention Rule).  The Rescission Rule unlawfully revokes reasonable protections designed to limit waste of natural gas by oil and gas companies on federal public and Indian lands resulting from venting, flaring (burning gas without capturing its energy), and equipment leaks.

2.      In 2016, BLM adopted the Waste Prevention Rule in response to numerous reports by other federal agencies and its own findings identifying rampant waste of publicly and tribally owned natural gas.  BLM determined that its existing waste-prevention regulation, Notice to Lessees and Operators of Onshore Federal and Indian Oil and Gas Leases (NTL-4A), 44 Fed. Reg. 76,600 (Dec. 27, 1979), was inadequate to prevent waste of publicly owned resources, and that further precautions were reasonable and necessary.

3.      To fulfill Congress's mandate that BLM must require lessees to use "all reasonable precautions to prevent waste," 30 U.S.C. § 225, the Waste Prevention Rule required operators to control venting, flaring, and leaks and bring more gas to market using proven, widely-available technologies that some (but not all) states already require, and that many companies already use voluntarily.

4.      In addition to reducing waste, the Waste Prevention Rule had many other benefits. Because oil and gas companies must pay royalties on captured gas, the Rule would have resulted in millions of dollars of increased royalty payments that states, tribes, and local governments could have used to fund schools, healthcare, and infrastructure.  The Waste Prevention Rule also reduced air and climate pollution that results when natural gas is leaked or vented into the air or burned in flares.

5.      The Waste Prevention Rule became effective on January 17, 2017.

Complaint for Declaratory and Injunctive Relief
Case No. 3:18-cv-5984                                                                                              1

6.      Shortly thereafter, President Trump and Defendant Secretary of the Interior Ryan Zinke directed BLM to reconsider the Waste Prevention Rule in Executive Order 13,738 and Secretarial Order 3349, respectively.

7.      On September 18, 2018, Secretary Zinke's BLM finalized the Rescission Rule.  The Rescission Rule was published in the Federal Register on September 28, 2018.  The Rescission Rule removes almost all of the Waste Prevention Rule requirements that "generate benefits of gas savings or reductions in methane emissions." 83 Fed. Reg. at 49,204.

8.      BLM justifies its decision to rescind these reasonable waste prevention measures by adding a new definition of "waste of oil and gas."  Pursuant to the new definition, the agency now considers only the profits of individual oil and gas companies—not economic losses or other impacts to the public—when deciding what constitutes waste.  This definition violates the plain language and intent of the Mineral Leasing Act, which requires BLM to consider not just private oil and gas interests, but also the "interests of the United States" and the "public welfare" when regulating waste of publicly owned oil and gas resources leased, in the public interest, to oil and gas companies.  30 U.S.C. § 187.  Indeed, BLM ignores altogether its legal obligations to protect the public and the environment under the Mineral Leasing Act and the, 43 U.S.C. §§ 1701(a)(8), 1732(b).

9.      Further, BLM fails to justify rescinding the Waste Prevention Rule without following the legally required procedure under the Administrative Procedure Act (APA), including (1) demonstrating that the new approach is permissible under the governing statutes, (2) showing there are "good reasons" for changing the rule, and (3) offering a "reasoned explanation" for its changed position. *Fed. Commc'ns Comm'n v. Fox Television Stations, Inc.,* 556 U.S. 502, 514–16 (2009).  BLM offers numerous justifications for the Rescission Rule that conflict with its prior conclusions and supporting evidence, but BLM fails to support these new positions.

10.      For example, BLM attempts to justify the Rescission Rule by claiming that the Waste Prevention Rule would have unnecessarily burdened energy production, constrained economic growth, and prevented job creation.  In fact, BLM's own evidence shows that the Rescission Rule will lead to a *decrease* in natural gas production of 299 billion cubic feet (bcf).  BLM analyzed the economic impact of the Rescission Rule on small businesses and estimates that the per-entity

Complaint for Declaratory and Injunctive Relief
Case No. 3:18-cv-5984                                                                                                      2

reduction in compliance costs would result in an average increase in profit margin of only 0.19%, an amount that is unlikely to constrain economic growth or prevent job creation.  BLM admits that the Rescission Rule will not affect the price, supply or distribution of energy, will not alter investment and employment decisions, and will not have a significant effect on a substantial number of small entities.

11.    BLM also attempts to justify the Rescission Rule based on a reassessment of costs and benefits that arbitrarily understates the Waste Prevention Rule's benefits and overstates its costs. For example, BLM relies on an "interim" value for the social cost of methane—a measure of the economic harm to society resulting from climate change—that cuts the Rule's projected benefits by 96% or 87%, depending on the discount rate used.  BLM does so by excluding significant domestic and global impacts.

12.    BLM also violates our country's environmental Magna Carta, the National Environmental Policy Act (NEPA).  BLM relies on a cursory 26-page Environmental Assessment (EA) rather than a more comprehensive Environmental Impact Statement (EIS) despite the Rescission Rule's significant environmental impacts.  The EA fails to acknowledge, let alone take a hard look at, the consequences to people and communities of the agency's decision to repeal a nationwide regulation and instead to rely on a patchwork of different state and tribal regulations. This failure is particularly acute relative to areas that are already violating federal air quality standards and in tribal communities that are already suffering from increased health risks as well as noise and light pollution and other environmental justice impacts caused by oil and gas development. BLM also fails to consider the cumulative impacts of the Rescission Rule in combination with any other past, present, or reasonably foreseeable actions—in particular the cumulative climate impact of the Rescission Rule in combination with the federal public and tribal lands oil and gas program as a whole.

13.    Despite its failure to consider these environmental impacts, BLM makes the unsupported conclusion in its Finding of No Significant Impact (FONSI) that rescinding the protective provisions of the Waste Prevention Rule nationwide "will not have a significant effect on the quality of the human environment, individually or cumulatively with other actions" and therefore

Complaint for Declaratory and Injunctive Relief
Case No. 3:18-cv-5984                                                                                                3

an EIS is not required. In fact, extensive record evidence shows that the Rescission Rule will have significant negative public health and climate impacts, and there is a high degree of controversy and uncertainty surrounding the use of the social cost of methane. For these and other reasons, BLM must prepare an EIS.

14. Plaintiffs Sierra Club, *et al.* (Conservation and Tribal Citizen Groups) challenge the Rescission Rule based on violations of the Mineral Leasing Act, 30 U.S.C. §§ 187, 225; Federal Land Policy Management Act (FLPMA), 43 U.S.C. §§ 1701(a)(8), 1702(c), 1732(b); NEPA, 42 U.S.C. § 4332(C); and the APA, 5 U.S.C. §§ 553, 706(2)(A), (C).

15. The Conservation and Tribal Citizen Groups respectfully seek a declaration that the Rescission Rule violates the Mineral Leasing Act, FLPMA, NEPA, and the APA, and is arbitrary, capricious, contrary to law, and in excess of authority within the meaning of 5 U.S.C. §§ 706(2)(A), (C). The Conservation and Tribal Citizen Groups also seek an order vacating the Rescission Rule and immediately reinstating all provisions of the Waste Prevention Rule.

**JURISDICTION AND VENUE**

16. This Court has jurisdiction pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) and 5 U.S.C. § 702 (the APA).

17. An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a). This Court may grant declaratory relief, injunctive relief, and other relief pursuant to 28 U.S.C. §§ 2201–2202 and 5 U.S.C. §§ 705–706.

18. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e)(1) because Plaintiffs reside in this district. Plaintiffs Sierra Club, Center for Biological Diversity, and Los Padres Forest Watch are all nonprofit corporations in good standing incorporated in the State of California. Plaintiff Sierra Club is headquartered in Oakland, and Center for Biological Diversity and Earthworks have offices in Oakland. Additionally, Plaintiffs Environmental Defense Fund, Natural Resources Defense Council, and The Wilderness Society maintain offices in this district. The Conservation and Tribal Citizen Groups collectively have more than 500,000 members living in California. This includes more than 160,000 members residing in the Northern District.

Complaint for Declaratory and Injunctive Relief
Case No. 3:18-cv-5984                                                                4

19.     Additionally, a substantial part of the events giving rise to this complaint occurred in this district because BLM specifically manages public oil and gas resources in this district that are subject to the Waste Prevention Rule.  BLM administers 15.2 million acres of public lands, 47 million acres of subsurface mineral estate, and 592,000 acres of Native American tribal mineral estate in California.  At the end of fiscal year 2016, BLM administered 530 oil and gas leases in California, covering 198,820 acres and containing around 6,854 producing wells.  In 2016, California operators developed more than 11 million barrels of federal oil and 12 bcf of federal natural gas, and flared more than 0.4 bcf of federal natural gas.

## INTRADISTRICT ASSIGNMENT

20.     Pursuant to Civil Local Rules 3-5(b) and 3-2(c), there is no basis for assignment of this action to any particular location or division of this Court.  However, Case No. 4:18-cv-05712-DMR, filed by the States of California and New Mexico, also challenges the Rescission Rule.  The legal claims in Case No. 4:18-cv-05712-DMR are nearly identical to the legal claims in this case.  Pursuant to Fed. R. Civ. P. 42 and Civil Local Rule 3-12(b), Plaintiffs intend to promptly file a motion to consolidate and/or relate the cases.

## PARTIES

21.     Plaintiff SIERRA CLUB, founded in 1892, is the nation's oldest and largest grassroots environmental organization.  Sierra Club is incorporated and headquartered in California, with a principal place of business at 2101 Webster St., Suite 1300, Oakland, CA 94612.  Sierra Club has about 400 employees who work in California, including about 200 employees who work at its headquarters in Oakland.  Sierra Club has thirteen local chapters in California, including five chapters in northern California that collectively have about 93,000 members:  the Loma Prieta, Mother Lode, Redwood, San Francisco Bay, and Ventana Chapters.  Sierra Club currently has more than 784,000 members nationwide, including more than 172,000 in California.  More than 55,200 of these members reside in the Northern District of California.  Sierra Club's mission is to explore, enjoy, and protect the wild places of the earth; to practice and promote the responsible use of the earth's ecosystems and resources; to educate and enlist humanity to protect and restore the quality of the natural and human environment; and to use all lawful means to carry out these objectives.  In

Complaint for Declaratory and Injunctive Relief
Case No. 3:18-cv-5984                                                                                         5

addition to helping people from all backgrounds explore nature and our outdoor heritage, Sierra Club works to promote clean energy, safeguard the health of communities, protect wildlife, and preserve our remaining wild places through grassroots activism, public education, lobbying, and legal action. Sierra Club pursues these objectives nationwide, including in California, by working to protect communities and lands administered by BLM from the harmful impacts of oil and gas development, including air and climate pollution from venting, leaking, and flaring in the oil and gas sector.

22.      Plaintiff LOS PADRES FORESTWATCH is a community-supported nonprofit organization working to protect the Los Padres National Forest and other public lands along California's central coast from Monterey County to Los Angeles County.  Its members and supporters – which number more than 500 in Monterey County and more than 13,000 throughout the Central Coast – are concerned about the environmental impacts of oil drilling on wildlife habitat, air and water quality, scenic views, and outdoor recreation in and around the Los Padres National Forest.  The goal of ForestWatch's oil accountability program is to ensure that any existing and proposed oil drilling operations near the Los Padres National Forest are conducted responsibly and in a way that reduces or avoids environmental impacts to the fullest extent possible.  Flaring, venting, and methane leaks occur in the Sespe Oil Field, the South Cuyama Oil Field, and the Russell Ranch Oil Field in Ventura, Santa Barbara, and San Luis Obispo counties; they also occur in scattered locations on BLM-administered lands in Monterey County.  For the last fourteen years, ForestWatch has worked to monitor existing and proposed oil wells in these areas to ensure compliance with environmental laws and regulations.

23.      Plaintiff CENTER FOR BIOLOGICAL DIVERSITY (the Center) is a nonprofit organization incorporated in the State of California that works through science, law, and policy to secure a future for all species, great or small, hovering on the brink of extinction.  The Center has offices throughout the country, including an office in Oakland, California.  The Center has over 63,000 members, including more than 14,400 in California.  Specifically, the Center has more than 4,000 members residing in the Northern District of California.  Although the Center pursues its objectives of protecting threatened and endangered species and their habitats nationwide, the Center specifically works to protect public lands administered by BLM in the Northern District of

Complaint for Declaratory and Injunctive Relief
Case No. 3:18-cv-5984                                                                                      6

California from the harmful impacts of oil and gas development, including methane emissions. The Center researches, documents, and raises awareness of the environmental consequences of oil and gas development and hydraulic fracturing in California. This campaign includes, among other efforts, publishing reports on aquifer contamination and seismic risks from oil and gas activities, rallying local governments, including Monterey County, to prohibit hydraulic fracturing, and litigating BLM's oil and gas leasing activities on California public lands.

24. Plaintiff EARTHWORKS is a membership-based 501(c)(3) nonprofit organization dedicated to protecting communities and the environment from the adverse impacts of mineral and energy development while promoting sustainable solutions. Earthworks was created in 2005, when two organizations (the Mineral Policy Center and the Oil & Gas Accountability Project) joined forces. Earthworks collaborates with communities and grassroots groups to reform government policies to better protect air, water, public lands and communities from threats posed by mineral development. Earthworks has an office in Oakland, where its Executive Director is based. Earthworks has more than 70,000 members nationwide, including over 9,200 members in California. Among Earthworks' members, approximately 4,200 live in the Northern District of California.

25. Plaintiff ENVIRONMENTAL DEFENSE FUND (EDF) is a national nonprofit organization representing over 450,000 members nationwide, including over 74,000 in California. Over 29,000 of these members reside in the Northern District of California. Since 1967, EDF has linked science, economics, and law to create innovative, equitable, and cost-effective solutions to urgent environmental problems. EDF employs more than 170 scientists, economists, engineers, business school graduates, and lawyers to help solve challenging environmental problems in a scientifically sound and cost-effective way. These staff work throughout the nation, including in two California offices, one in San Francisco, and one in Sacramento. More than 90 EDF staff members live and work in California. EDF pursues initiatives at the state and national levels designed to protect human health and the environment. Among these initiatives, EDF has worked to reduce waste from oil and gas operations on public lands along with its associated health-harming and climate-altering air pollution.

Complaint for Declaratory and Injunctive Relief
Case No. 3:18-cv-5984                                                                7

26. Plaintiff NATURAL RESOURCES DEFENSE COUNCIL (NRDC) is a non-profit environmental membership organization that uses law, science, and the support of more than 384,000 members throughout the United States, including nearly 67,000 in California, to protect wildlife and wild places and to ensure a safe and healthy environment for all living things. More than 28,000 NRDC's members reside in the Northern District of California. NRDC has offices throughout the country, including offices in San Francisco and Santa Monica, California. NRDC has a long-established history of working to protect public lands and clean air. In particular, NRDC has worked for decades to protect public lands, nearby communities, wildlife habitat and air quality from the threats posed by oil and gas development.

27. Plaintiff THE WILDERNESS SOCIETY (TWS) has a mission to protect wilderness and inspire Americans to care for our wild places. TWS has offices throughout the country, including offices in San Francisco and Pasadena, California, and a California Desert representative. TWS has more than 1,000,000 members and supporters around the West, including more than 91,000 in California. TWS has a long-standing interest in the management of public lands across the nation, and engages frequently in land use planning and project proposals that could potentially affect wilderness quality lands, wildlife habitat, and other natural resources, as well as the health, safety and quality of life of surrounding communities. TWS also has a long-standing interest in the use of our public and tribal lands for energy development, including supporting a transition to renewable energy, and ensuring that oil and gas and other energy development are focused in suitable locations and completed in a manner that does not harm other values. TWS has been actively involved in planning, policy, and conservation efforts in California, including the Northwest California Integrated Resource Management Plan for BLM lands in Humboldt, Mendocino, Del Norte, Trinity, Shasta, Siskiyou, Butte, and Tehama Counties. TWS also focuses on protecting the Cascade-Siskiyou National Monument, the San Gabriel Mountains, Sierra Nevada, the California Desert, and the Central Coast.

28. Plaintiff NATIONAL WILDLIFE FEDERATION (NWF), founded in 1936, is one of the nation's premier grassroots non-profit conservation advocacy and education organizations. The group is America's largest conservation organization with a mission to ensure that wildlife thrive in

Complaint for Declaratory and Injunctive Relief
Case No. 3:18-cv-5984                                                                    8

a rapidly changing world. Headquartered in Reston, Virginia, NWF has offices throughout the country, including an office in California. NWF has more than six million members and supporters and has affiliate organizations in 53 states and territories, including more than 59,000 members and 2,800 affiliate members in California. Over 20,700 of NWF's members reside in the Northern District of California. NWF has a strong history of protecting public lands for wildlife and outdoor recreation by its members and works to combine strong science, federal and state policy development, education, litigation, and grassroots organizing.

29. Plaintiff CITIZENS FOR A HEALTHY COMMUNITY (CHC) is a grass-roots organization with more than 500 members formed in 2009 for the purpose of protecting people and their environment from the impacts of BLM-authorized oil and gas development in the Delta County region of Colorado. CHC's members and supporters include organic farmers, ranchers, vineyard and winery owners, sportsmen, realtors, and other concerned citizens impacted by oil and gas development. CHC members have been actively involved in commenting on BLM's oil and gas activities.

30. Plaintiff DINÉ CITIZENS AGAINST RUINING OUR ENVIRONMENT (Diné C.A.R.E.) is an all-Navajo organization comprised of a federation of grassroots community activists in Arizona, New Mexico and Utah who strive to educate and advocate for traditional teachings derived from Diné Fundamental Laws. Diné C.A.R.E.'s goal is to protect all life in their ancestral homeland by empowering local and traditional people to organize, speak out, and determine the outlook of the environment through civic involvement and engagement in decision-making processes relating to tribal development, including oil and gas development on public and tribal lands in the San Juan Basin of New Mexico.

31. Plaintiff ENVIRONMENTAL LAW AND POLICY CENTER (ELPC) is a Midwest based not-for-profit corporation and legal advocacy organization concerned with improving environmental quality and protecting natural resources in the Midwest and Great Plains states. ELPC works on a variety of issues throughout the Midwest and Great Plains states, including advocating for clean air, clean water, renewable energy, sustainable transportation, and protecting natural places. ELPC's work includes efforts to minimize negative environmental impacts from oil

Complaint for Declaratory and Injunctive Relief
Case No. 3:18-cv-5984                                                                                          9

and gas development.  ELPC has members in North Dakota whose recreational and aesthetic interests are impacted by the wasteful and polluting practices of venting and flaring natural gas from oil wells.

32.     Plaintiff FORT BERTHOLD PROTECTORS OF WATER AND EARTH RIGHTS (Fort Berthold POWER) is a grassroots, member-led community group that works to promote responsible energy development in and around Fort Berthold Indian Reservation in North Dakota. Fort Berthold POWER is committed to working toward a sustainable society with an awareness for all life.  The mission of Fort Berthold POWER is to conserve and protect the land, water, and air on which all life depends.  Fort Berthold POWER works to engage citizens in activities that protect the environment, facilitates learning for members to disseminate information on environmental issues that affect all people, and expands members' ability to take effective action to address issues that affect land, air, and water.

33.     Plaintiff MONTANA ENVIRONMENTAL INFORMATION CENTER (MEIC) is a nonprofit organization founded in 1973 with approximately 5,000 members and supporters throughout the United States, including in California.  MEIC is dedicated to the preservation and enhancement of the natural resources and natural environment of Montana and to the gathering and disseminating of information concerning the protection and preservation of the human environment through education of its members and the general public concerning their rights and obligations under local, state, and federal environmental protection laws and regulations.  MEIC is also dedicated to assuring that federal officials comply with and fully uphold the laws of the United States that are designed to protect the environment from pollution.

34.     Plaintiff SAN JUAN CITIZENS ALLIANCE (SJCA), founded in 1986, organizes people to protect the water, air, lands, and the character of rural communities in the San Juan Basin. SJCA focuses on four program areas, one of which is the San Juan Basin Energy Reform Campaign, which seeks to ensure proper regulation and enforcement of the oil, gas, and coal industry and facilitate a transition to a renewable energy economy.  SJCA has been active in BLM oil and gas issues in the San Juan Basin since the early 1990s.  SJCA has 1000 members.

Complaint for Declaratory and Injunctive Relief
Case No. 3:18-cv-5984                                                                                                      10

35. Plaintiff WESTERN ORGANIZATION OF RESOURCE COUNCILS (WORC) is a nonprofit organization that works to advance the vision of a democratic, sustainable, and just society through community action. WORC is committed to building sustainable environmental and economic communities that balance economic growth with the health of people and stewardship of their land, water, and air resources. WORC is a network of grassroots organizations from seven states that includes approximately 15,200 members and 39 local community group chapters. WORC's members are family farmers and ranchers, townspeople, and rural residents concerned about their communities and environment. WORC's current goals include organizing and educating landowners, residents, mineral estate owners and water users about the impacts of oil and gas exploration and development and ensuring that the BLM enforces all applicable laws and regulations related to oil and gas leasing and development.

36. Plaintiff WILDERNESS WORKSHOP is a nonprofit organization based in Carbondale, Colorado that is dedicated to preservation and conservation of the wilderness and natural resources of the White River National Forest and adjacent public lands. Wilderness Workshop engages in research, education, legal advocacy and grassroots organizing to protect the ecological integrity of local landscapes and public lands. Wilderness Workshop focuses on the monitoring and conservation of air and water quality, wildlife species and habitat, natural communities and lands of wilderness quality. Wilderness Workshop was founded in 1967 and has approximately 800 members.

37. Plaintiff WILDEARTH GUARDIANS (Guardians) is a non-profit conservation organization dedicated to protecting and restoring the wildlife, wild places, wild rivers, and health of the American West. Guardians has offices in Colorado, Montana, New Mexico, Arizona, Washington, and Oregon. With more than 120,000 members and supporters, Guardians works to sustain a transition from fossil fuels to clean energy in order to safeguard the West.

38. Plaintiff WYOMING OUTDOOR COUNCIL (WOC) was founded in 1967. It is Wyoming's oldest independent conservation organization. WOC works to protect Wyoming's environment and quality of life for future generations. Its goal is to develop productive and lasting solutions for managing natural resources through collaborative engagement with stakeholders and

decision makers. WOC believes responsible environmental stewardship is fundamental to safeguarding public health and Wyoming's quality of life. WOC's nearly 2,000 members recognize that Wyoming's landscapes, wildlife, and diverse cultural history are vital resources, and that everyone relies on the state's clean air and water.

39. The Conservation and Tribal Citizen Groups bring this action on behalf of themselves and their adversely affected members. For many years, the Conservation and Tribal Citizen Groups have actively advocated for strong BLM standards for the reduction of waste and associated air pollution from federal and tribal leases, and have devoted significant resources toward that effort. For example, the Conservation and Tribal Citizen Groups and their members submitted scoping comments and comments on the proposed Waste Prevention Rule and participated in public meetings and hearings. The Conservation and Tribal Citizen Groups also have intervened to defend the Waste Prevention Rule from a lawsuit filed by several states and industry groups. Further, the Conservation and Tribal Citizen Groups' staff and members helped to successfully oppose an attempt to persuade Congress to repeal the Rule using the Congressional Review Act. Moreover, the Conservation and Tribal Citizen Groups successfully sued BLM on two separate occasions when it unlawfully attempted to first stay, and then suspend, the Waste Prevention Rule's compliance dates. *California v. BLM*, 286 F. Supp. 3d 1054 (N.D. Cal. 2018) (*California II*); *California v. BLM*, Nos. 17-cv-3804-EDL & 17-cv-3885-EDL, 2017 WL 4416409, at *14 (Oct. 4, 2017) (*California I*). Finally, the Conservation and Tribal Citizen Groups and their members submitted comments on BLM's proposed Rescission Rule.

40. Many Conservation and Tribal Citizen Group members live in communities that receive income from royalties from oil and gas development on public and tribal lands that is used to fund schools, healthcare, and infrastructure. Other Conservation and Tribal Citizen Group members are partial royalty owners of tribal leases. The Rescission Rule will reduce these royalty payments.

41. Numerous Conservation and Tribal Citizen Group members live, work, and recreate in and around, and otherwise use and enjoy, lands where oil and gas development is occurring or has been proposed on federal and tribal leases and are therefore likely to be affected by the associated air pollution and other impacts from such development. For example, some members live on or near

split estate lands (where the federal government owns the minerals underlying their property) that are already subject to oil and gas development or are likely to be developed in the future. Other members use public lands in and around federal and tribal leases for recreation, wildlife viewing, solitude, and scientific study. The Rescission Rule will adversely affect these members. As a result of BLM rescinding almost all provisions of the Waste Prevention Rule that reduce waste, operators will be permitted to release more air pollution and flare more gas—which causes bright, incandescent fires at flare stacks and excessive noise. This harms the Conservation and Tribal Citizen Groups' members by disrupting their daily lives, subjecting them to adverse health risks, and reducing their enjoyment of the public, split estate, and tribal lands where they live and recreate.

42. Defendant RYAN ZINKE is the Secretary of the Interior. The Conservation and Tribal Citizen Groups sue Secretary Zinke in his official capacity. Secretary Zinke oversees the development of energy, including natural resource extraction, on federal and tribal leases. Secretary Zinke is ultimately responsible for BLM's Rescission Rule.

43. Defendant BUREAU OF LAND MANAGEMENT is an agency of the United States within the Department of the Interior. BLM is responsible for managing publicly owned lands and minerals, in accordance with federal law. BLM promulgated the Waste Prevention Rule, and later promulgated the Rescission Rule.

44. Defendant U.S. DEPARTMENT OF THE INTERIOR is an executive branch department that oversees BLM, and is thus ultimately responsible for BLM's Rescission Rule.

<strong>BACKGROUND</strong>

**I.    BLM Adopted the Waste Prevention Rule in 2016 to Ensure Operators Take "All Reasonable Precautions" Against the Rampant Waste of Public Resources as Required by the Mineral Leasing Act.**

45. BLM developed the Waste Prevention Rule to fulfill its obligation under the Mineral Leasing Act to ensure that when oil and gas companies are permitted to develop publicly owned natural resources, they "use all reasonable precautions to prevent waste of oil or gas." 30 U.S.C. § 225.

46. Some ways oil and gas companies can waste natural gas are by intentionally venting it into the air, allowing it to leak from their equipment, or burning it in flares.

Complaint for Declaratory and Injunctive Relief
Case No. 3:18-cv-5984                                                                                    13

47. The Department of the Interior has long regulated venting and flaring of publicly owned natural gas produced from federal leases. *See* NTL-4A, 44 Fed. Reg. 76,600 (Dec. 27, 1979). NTL-4A required operators to get BLM approval prior to venting or flaring natural gas from oil or gas wells. It also defined when operators must pay the federal government royalties for wasted natural gas.

48. In the several decades since the Department of the Interior adopted NTL-4A, modern hydraulic fracturing techniques and directional drilling have changed how oil and gas production occurs, and new, cost-effective technologies used by oil and gas operators have been developed to minimize waste. 81 Fed. Reg. at 83,017. Prior to the Waste Prevention Rule, NTL-4A had not been revised to address these new realities.

49. In 2008, the Government Accountability Office (GAO) expressed concern about the royalty structure governing oil and gas production on Federally managed lands. GAO recognized that an evaluation of the federal oil and gas fiscal systems was overdue because the Department of the Interior had not evaluated these systems since NTL-4A was issued. GAO, *Oil and Gas Royalties: The Federal System for Collecting Oil and Gas Revenues Needs Comprehensive Reassessment*, GAO-08-691 at 8 (Sept. 2008).

50. Two years later, GAO raised concerns about BLM's inadequate regulations allowing waste of public resources. GAO recommended that BLM update its regulations to take advantage of opportunities to capture additional recoverable natural gas using available technologies. GAO, *Federal Oil and Gas Leases: Opportunities Exist to Capture Vented and Flared Natural Gas, Which Would Increase Royalty Payments and Reduce Greenhouse Gases*, GAO-11-34 at 27 (Oct. 2010).

51. BLM estimated that federal oil and gas lessees vented or flared more than 462 bcf of natural gas on public and tribal lands between 2009 and 2015. This is enough gas to supply over 6.2 million households—or every household in the States of Colorado, Montana, New Mexico, North Dakota, South Dakota, Utah, and Wyoming—for one year. This figure does not include natural gas that leaked from various pieces of drilling, storage, and processing equipment.

52. BLM determined that the volume of waste is "unacceptably high." 81 Fed. Reg. at 83,015. In addition to wasting a valuable natural resource, states, tribes, and federal taxpayers lost

Complaint for Declaratory and Injunctive Relief
Case No. 3:18-cv-5984                                                                                        14

millions of dollars annually in royalty revenues.  These revenues otherwise would have been available to fund schools, health care, and infrastructure.

53.     Spurred by these concerns, in 2014, BLM commenced the rulemaking process for the Waste Prevention Rule.  BLM solicited extensive stakeholder feedback through public forums held in communities across the country.  In early 2016, BLM issued a proposed rule incorporating this feedback.  BLM again held public hearings and tribal outreach sessions at locations around the country.  The agency received more than 330,000 public comments.  BLM finalized the Waste Prevention Rule on November 18, 2016.  81 Fed. Reg. at 83,008.

54.     BLM determined that it was necessary to update NTL-4A because it did not reflect modern technologies and practices already in use by at least some operators, was subject to inconsistent application, and was not effective in minimizing waste and lost royalties, as demonstrated by the large volumes of preventable waste occurring on public and tribal lands.  BLM was also concerned about the burden on BLM and operators that resulted from requiring individualized applications to vent or flare.  BLM noted that its field offices were receiving a growing number of applications to vent or flare, up from just 50 in 2005 to more than 1,200 in 2014.

55.     BLM replaced NTL-4A's individualized application process with nationally uniform regulations to reduce waste from venting, flaring, and leaks during oil and gas production activities.

56.     BLM recognized that the required waste prevention measures would fulfill its obligations under the Mineral Leasing Act by increasing natural gas supplies, boosting royalty payments to states, tribes, and American taxpayers, reducing environmental damage, and better ensuring the safe and responsible development of oil and gas resources.

57.     Specifically, the Waste Prevention Rule required operators to capture natural gas that they would otherwise vent or flare by establishing a capture target that tightens over time.  The Waste Prevention Rule also set specific performance standards to reduce waste from specified types of equipment, including storage tanks and pneumatic controllers, and required operators to inspect their facilities for leaks periodically, and to repair promptly any leaks identified.  Additionally, to encourage operators to address waste prevention prior to drilling, the Waste Prevention Rule required them to submit waste management plans with their applications for permits to drill.

58. The Waste Prevention Rule included exemptions if compliance with particular provisions would cause operators to abandon development of significant oil or gas resources.

59. In addition to mandating action to prevent waste, the regulations also clarified when produced gas lost through venting, flaring, or leaks is subject to royalties, and when operators may use gas royalty-free on site.

60. The Waste Prevention Rule's effective date was January 17, 2017. Starting that day, operators were required to comply with some of the Waste Prevention Rule's requirements, such as submitting waste minimization plans. But for other provisions, such as the gas capture targets and leak detection and repair requirements, BLM set January 17, 2018 as the initial compliance deadline.

61. BLM concluded that it had legal authority to issue the Waste Prevention Rule under several statutes. BLM explained that the Waste Prevention Rule met the agency's obligation under the Mineral Leasing Act to require lessees to take "all reasonable precautions" to prevent waste, 30 U.S.C. § 225, and to require operators to exercise "reasonable diligence, skill, and care" in their operations and observe "such rules . . . for the prevention of undue waste as may be prescribed by [the] Secretary," *id.* § 187. *See* 81 Fed. Reg. at 83,020.

62. BLM recognized that the Mineral Leasing Act "rests on the fundamental principle that the public should benefit from mineral production on public lands" and that an "important means of ensuring that the public benefits from mineral production on public lands is minimizing and deterring the waste of oil and gas produced from the Federal mineral estate." *Id.* at 83,019–20.

63. BLM further explained that the Rule was justified by its Mineral Leasing Act and FLPMA authorities to regulate the environmental impacts of oil and gas development from federal and tribal leases. BLM recognized that the Mineral Leasing Act "requires oil and gas leases to include provisions 'for the protection of the interests of the United States . . . and for the safeguarding of the public welfare,' which includes lease terms for the prevention of environmental harm." *Id.* at 83,020 (quoting 30 U.S.C. § 187).

64. BLM also recognized its FLPMA duty to "prevent unnecessary or undue degradation of the [public] lands." *Id.* (citing 43 U.S.C. § 1732(b)). Additionally, the agency pointed to FLPMA's express declaration that "BLM should balance the need for domestic sources of minerals

Complaint for Declaratory and Injunctive Relief
Case No. 3:18-cv-5984                                                                              16

against the need to 'protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resources, and archeological values; . . . [and] provide for outdoor recreation and human occupancy and use.'" *Id.* (quoting 43 U.S.C. 1701(a)(8)).

65.    BLM also concluded that the Waste Prevention Rule helps to meet its statutory trust responsibilities with respect to the development of Indian oil and gas interests.

66.    In the proposed Waste Prevention Rule, BLM expressly recognized that it must consider the broader public interest when regulating waste under its statutory authorities:

> A focus on oil development rather than gas capture may be a rational decision for an individual operator, but it does not account for the broader impacts of venting and flaring, including the costs to the public of losing gas that would otherwise be available for productive use, the loss of royalties that would otherwise be paid to States, tribes, and the Federal Government on the lost gas, and the air pollution and other impacts of gas wasted through venting or flaring . . . . Thus, a decision to vent or flare that may make sense to the individual operator may constitute an avoidable loss of gas and unreasonable waste when considered from a broader perspective and across an entire field.

81 Fed. Reg. 6616, 6638 (Feb. 8, 2016).

67.    BLM estimated that the Rule would reduce wasteful venting and leaking methane emissions by 35% and wasteful flaring by 49%. BLM also estimated that the Waste Prevention Rule would increase royalties by up to $14 million per year.

68.    BLM found that the Waste Prevention Rule would significantly benefit local communities, public health, and the environment. For example, it would reduce flaring's visual and noise impacts.

69.    BLM further found that the Waste Prevention Rule would protect communities from smog and carcinogenic air toxic emissions, and reduce greenhouse gas emissions. BLM estimated that each year the Waste Prevention Rule would reduce emissions of methane by 175,000 to 180,000 tons, VOCs by 250,000 to 2367,300 tons, and hazardous air pollutants by 1,859 to 2,031 tons.

70.    BLM recognized that the Waste Prevention Rule benefited people living in Indian Country. BLM acknowledged the Rule would reduce ozone pollution and air toxic pollution as well as the noise and light pollution associated with flares in these regions.

Complaint for Declaratory and Injunctive Relief
Case No. 3:18-cv-5984                                                                                          17

71.     BLM concluded that the Waste Prevention Rule's requirements were "economical, cost-effective, and reasonable." 81 Fed. Reg. at 83,009. BLM modeled its rules on some of the most effective State regulations adopted to address increased flaring, waste of minerals, and air pollution, such as Colorado's regulations. These state regulations have been in place for years.

72.     At the same time, BLM recognized that its waste regulations had the potential to overlap with other federal, state, or tribal regulations. BLM reduced any overlap by aligning the Waste Prevention Rule with similar Environmental Protection Agency (EPA) and state rules, and including specific exemptions from the Rule where operators were already complying with EPA rules. The Waste Prevention Rule also included a provision for granting variances from particular requirements if a state or tribe could demonstrate that their regulations were equally as effective.

73.     BLM found that the patchwork of EPA and other state regulations did not obviate and indeed underscored the need for uniform standards for public and Indian lands across the country. Specifically, BLM recognized that it has an independent legal obligation to prevent waste, and an interest as a land and resource manager to ensure that oil and gas development on federal leases is conducted in a manner designed to minimize its harmful impacts. BLM specifically contrasted its obligations under the Mineral Leasing Act with other statutory regimes that authorize federal agencies to delegate administration and enforcement to a state agency.

74.     BLM also recognized that neither EPA nor state and tribal regulations fully address waste from BLM-managed leases. For example, over 80% of wells subject to the Waste Prevention Rule are not subject to EPA or state leak detection and repair standards. EPA regulations do not address flaring and only target new and not existing sources. Existing sources are responsible for a large percentage of the waste of publicly owned natural gas.

75.     BLM also conducted a comprehensive review of state regulations and found that no state or tribe had regulations that comprehensively addressed venting, flaring, and leaks. BLM recognized that, of the states with extensive oil and gas operations on federal leases, only one has comprehensive requirements to reduce flaring, and only one has comprehensive requirements to control venting and leaks. BLM also acknowledged that state laws and regulations are subject to change, which could lead to unnecessary waste or environmental impacts.

76.     BLM prepared a regulatory impact analysis (RIA) that examined the Waste Prevention Rule's costs and benefits.  Overall, BLM concluded that the Waste Prevention Rule's benefits outweighed its costs "by a significant margin" with "net benefits ranging from $46 million to $199 million per year." *Id.* at 83,014.  This is true even though BLM acknowledged that its cost estimates were conservative and likely overstated the Rule's impacts.  Moreover, BLM did not monetize many of the Rule's benefits, such as reducing air pollution and the associated reduced health impacts.

77.     BLM also evaluated the Waste Prevention Rule's costs to small businesses.  It determined that the average annual compliance costs would range from about $44,600 to $65,800 for each company.  Based on the midpoint average of $55,200, BLM estimated that compliance costs would constitute approximately 0.15% of per company profits.  BLM therefore concluded that the Waste Prevention Rule was not expected to impact investment decisions or employment in the oil and gas industry.

78.     BLM considered the impacts of the Waste Prevention Rule on low-production or "marginal" wells.  The agency rejected requests to exempt marginal wells from leak detection and repair requirements.

79.     BLM recognized that roughly 85% of wells on federal and tribal leases are classified as low production wells.  Therefore, absent evidence showing that these wells are unlikely to leak significant volumes of gas, such an exemption would greatly reduce the Rule's waste reduction benefits.  BLM pointed to peer-reviewed studies showing that both high and low production wells can have high volume leaks.

80.     BLM also found that the leak detection and repair requirements were unlikely to cause a significant number of individual well shut-ins or any lease-wide shut-ins, for several reasons.  First, there are third-party providers that offer leak detection services at a modest cost, and operators may recoup some of these costs through the saved gas.  Second, the Rule allowed operators to request approval of an alternative leak detection program, provided they could demonstrate that it was equally effective in detecting leaks.  Furthermore, the Rule allowed operators to request approval of an alternative program that was not as effective as the Rule if compliance with the Rule

Complaint for Declaratory and Injunctive Relief
Case No. 3:18-cv-5984                                                                                          19

would cause the operator to cease production and abandon significant recoverable oil or gas reserves.

81.    BLM analyzed the benefits of the Rule using the social cost of methane.  The social cost of methane measures the economic harm to society from climate change, expressed as the dollar value of the total damages from emitting one ton of methane into the atmosphere.

82.    BLM relied upon an estimate of the social cost of methane published in peer-reviewed literature that includes the global economic harm of climate change.  This measure was approved by an Interagency Working Group, made up of representatives of twelve agencies, including the Department of the Interior and the White House Office of Management and Budget. This estimate was based on a closely related social cost estimate for carbon dioxide developed by the Interagency Working Group in 2010.  It was subject to extensive public comment and peer review, including review by the National Academy of Sciences.

83.    While recognizing the limitations of the social cost of methane metric, BLM nonetheless concluded that it represented the best available information about the monetized social benefits of methane reductions to be used in a cost-benefit analysis.

## II.    Industry and the New Administration Made Multiple Unsuccessful Attempts to Avoid Compliance with the Waste Prevention Rule.

84.    The Western Energy Alliance (WEA), Independent Petroleum Association of America, and the states of North Dakota, Wyoming, and Montana challenged the Waste Prevention Rule in the District of Wyoming.  The district court denied their request for a preliminary injunction. The Waste Prevention Rule went into effect on January 17, 2017.

85.    WEA, the American Petroleum Institute (API), and other industry groups also lobbied Congress to repeal the Rule using the Congressional Review Act.  However, a majority of Senators voted against the motion to proceed to debate on the Congressional Review Act resolution on May 10, 2017.

86.    Meanwhile, in January 2017, the Trump administration was inaugurated.  On March 28, 2017, President Trump issued Executive Order No. 13,783, directing the Secretary of the Interior to consider revising or rescinding the Waste Prevention Rule.  Exec. Order No. 13,783, Promoting

Energy Independence and Economic Growth, at § 7(b)(iv), 82 Fed. Reg. 16,093, 16,093 (Mar. 28, 2017).

87.    The next day, Secretary Zinke issued Secretarial Order No. 3349, directing the BLM Director to review the Waste Prevention Rule and report to the Assistant Secretary of Land and Minerals Management within 21 days on whether the Waste Prevention Rule is fully consistent with the policies set forth in Executive Order No. 13,783.  Secretary of the Interior, Order No. 3349, American Energy Independence, at § 5(c)(ii) (Mar. 29, 2017).

88.    In response to the Secretarial Order, BLM determined that the Waste Prevention Rule is not consistent with Executive Order No. 13,783's policies.  Under Secretary Zinke's leadership, BLM then took numerous, unsuccessful steps to prevent its own Waste Prevention Rule from going into full effect.

89.    On June 15, 2017, without notice or an opportunity for public comment, BLM issued a notice under 5 U.S.C. § 705 staying all sections of the Waste Prevention Rule with compliance dates one year or more after the Rule's effective date.  82 Fed. Reg. 27,430 (June 15, 2017).

90.    The Conservation and Tribal Citizen Groups, as well as the States of California and New Mexico, filed suit against BLM's stay in the Northern District of California.

91.    On October 4, 2017, the court granted the Conservation and Tribal Citizen Groups' and the states' motions for summary judgment, holding that BLM's attempt to stay the Rule's compliance dates violated the APA.  *California I*, 2017 WL 4416409, at *14.  The court vacated the stay, and ordered BLM to reinstate the Rule in its entirety.  *Id.*

92.    One day after the *California I* court reinstated the Waste Prevention Rule, BLM proposed to suspend most of the Rule's compliance obligations for a year.  82 Fed. Reg. 46,458 (Oct. 5, 2017).  BLM finalized the Suspension Rule on December 8, 2017.  82 Fed. Reg. 58,050 (Dec. 8, 2017) (Suspension Rule).

93.    In the Suspension Rule, BLM indicated that in response to Executive Order 13,783 and Secretarial Order 3349, it found that "some provisions of the [Waste Prevention Rule] add considerable regulatory burdens that unnecessarily encumber energy production, constrain economic

Complaint for Declaratory and Injunctive Relief
Case No. 3:18-cv-5984                                                                                        21

growth, and prevent job creation." 82 Fed. Reg. at 58,050.  BLM identified concerns about the Rule's impacts on marginal wells and small operators.

94.    The Conservation and Tribal Citizen Groups, as well as the States of California and New Mexico, again filed suit against the Suspension Rule in the Northern District of California.

95.    On February 22, 2018, the court granted the Conservation and Tribal Citizen Groups' and the states' motions for a preliminary injunction. *California II*, 286 F. Supp. 3d at 1058.

96.    The *California II* court recognized that BLM's newfound concerns about the Waste Prevention Rule's burdens were inconsistent with its prior findings that the Rule was cost-effective and reasonable. *Id.* at 1065.  Accordingly, the court held that "BLM must 'provide a more detailed justification than what would suffice for a new policy created on a blank slate.'" *Id.* (quoting *Fox Television*, 556 U.S. at 515).  The court then reviewed each of BLM's justifications for the Suspension Rule in turn and found them lacking.

97.    For example, the *California II* court held that BLM provided no factual support for its claims that the Rule would encumber energy production, constrain economic growth, and prevent job creation, or that it would be an economic burden for operators of marginal wells. *Id.*  Similarly, the court found no support for BLM's claim that the Rule would disproportionately affect small operators, holding that this conclusion was entirely inconsistent with BLM's own finding that the Suspension Rule would not have a significant economic impact on small businesses. *Id.* at 1066.

98.    The *California II* court also held that the additional emissions caused by suspending the Waste Prevention Rule for a year "will cause irreparable public health and environmental harm to [members of the public] who live and work on or near public and tribal lands with oil and gas development." *Id.* at 1073.  The court recognized the health risks in areas that are violating federal ozone standards, explaining that increasing VOC emissions in "at risk communities" could "lead[] to and exacerbate[e] impaired lung functioning, serious cardiovascular and pulmonary problems, and cancer and neurological damage." *Id.* at 1073–74.

99.    Because the *California II* court enjoined the Suspension Rule, the Waste Prevention Rule went fully into effect, and operators were required to comply with all of its provisions.

100.    Faced with these compliance obligations, industry groups and the states who challenged the Waste Prevention Rule in the District of Wyoming sought various forms of relief in that court.

101.    On April 4, 2018, the District of Wyoming stayed implementation of the Waste Prevention Rule until BLM finalized the Rescission Rule.  Order, *Wyoming v. U.S. Dep't of the Interior*, No. 2:16-cv-00285-SWS (D. Wyo. Apr. 4, 2018), ECF No. 215.  Despite having previously found that Petitioners were not entitled to a preliminary injunction, the District of Wyoming issued the stay.  In issuing the stay, the District of Wyoming did not consider the four factors requisite for obtaining a preliminary injunction.

102.    The Conservation and Tribal Citizen Groups and the states of California and New Mexico appealed that decision to the Tenth Circuit.  On June 4, 2018, the Tenth Circuit denied motions to dismiss the appeal.  In a split 2-1 decision, the court also denied the appellants' motions for a stay pending appeal.  *Wyoming v. U.S. Dep't of the Interior*, Nos. 18-8027, 18-8029, 2018 WL 2727031, at *1–2 (10th Cir. June 4, 2018).  Merits briefing in that appeal is ongoing.

**III.    BLM Rescinds the Waste Prevention Rule Based on Unsupported Assertions.**

103.    The same day that the *California II* Court preliminarily enjoined the Suspension Rule, Secretary Zinke's BLM proposed to rescind almost all of the requirements in the Waste Prevention Rule that would "generate benefits of gas savings or reductions in methane emissions" on the basis that the provisions "pose a compliance burden to operators."  83 Fed. Reg. 7,924, 7,938 (Feb. 22, 2018) (proposed Rescission Rule).

104.    BLM only allowed 60 days for public comments on the proposed Rescission Rule.  BLM did not hold any public hearings.  BLM did not hold any tribal consultation hearings.  BLM did not grant requests to extend the comment period.

105.    BLM received over 600,000 public comments.  The vast majority of these comments opposed BLM's proposal.  The Conservation and Tribal Citizen Groups and thousands of their members submitted comments.

106.    BLM published the final Rescission Rule on September 28, 2018.  83 Fed. Reg. at 49,184.

107. The Rescission Rule eliminates almost all of the Waste Prevention Rule's provisions responsible for its waste reduction benefits, including requirements that operators submit waste minimization plans, conduct leak detection and repair, and retrofit outdated pneumatic devices and storage vessels.

108. With respect to venting and flaring from oil wells, the Rescission Rule replaces the capture percentage requirement with a provision that allows royalty-free venting or flaring as long as it is consistent with any applicable state or tribal regulations. If no such regulations exist, the Rescission Rule imposes a system similar to NTL-4A, in which BLM must approve all applications to vent or flare gas.

109. BLM first justifies the Rescission Rule by claiming that the Waste Prevention Rule exceeded BLM's statutory authority. BLM attempts to circumscribe its own authority by pointing to its purported "longstanding" practice of interpreting "waste" as delimited by "the economics of capturing and marketing the gas" as perceived by an individual operator. In the Rescission Rule, BLM thus defines "waste of oil or gas" to include only those measures "where compliance costs are not greater than the monetary value of the resources they are expected to conserve." 43 C.F.R. § 3179.3. BLM's new definition of waste focuses exclusively on whether a private operator is making a profit, which depends on each company's individual financial and operational choices.

110. BLM fails to reconcile its new argument that the Waste Prevention Rule exceeds BLM's statutory authority with the arguments that it made in adopting the Waste Prevention Rule and defending it in court. In particular, BLM fails to reconcile its new definition of waste with its previous recognition in 2016 that, when regulating waste, it also must consider the interests of the public and state, tribal, and local governments entitled to royalty payments.

111. In the Rescission Rule, BLM claims that the Waste Prevention Rule usurped the Clean Air Act authority of the EPA, states, and tribes. But BLM provides no legal support for this claim. Nor does BLM reconcile its new legal position with the arguments that it made in adopting the Waste Prevention rule and defending it in court.

112. BLM provides no explanation for how the Rescission Rule is consistent with its statutory duties to protect the interests of the United States and the public welfare under the Mineral

Leasing Act, 30 U.S.C. § 187, or to protect air and atmospheric values under FLPMA, 43 U.S.C. §§ 1701(a)(8), 1732(b).  BLM ignores these statutory obligations altogether.

113.    Like the Suspension Rule, BLM justifies the Rescission Rule based on the review mandated by Executive Order 13,783 and Secretarial Order 3349.  BLM found the Waste Prevention Rule "would have added . . . regulatory burdens that unnecessarily encumber energy production, constrain economic growth, and prevent job creation."  83 Fed. Reg. at 49,184, 49,185.  BLM provides no support for these claims, which are contradicted by its conclusion that the Rescission Rule will not affect price, supply or distribution of energy, will not alter investment and employment decisions, and will *decrease* gas production by 299 bcf.

114.    BLM analyzes the Rescission Rule's economic impact on small businesses and estimates that the per-entity reduction in compliance costs results in an average increase in profit margin of only 0.19%.  BLM concludes that the Rescission Rule will not have a significant effect on a substantial number of small entities.

115.    In the Rescission Rule, BLM claims that the compliance costs associated with the pneumatic controller, pneumatic diaphragm pumps, and leak detection and repair requirements would especially burden marginal wells.  Although in 2016 BLM recognized that marginal wells could take advantage of the Rule's exemptions, BLM now claims that the exemption process poses "excessive" burdens.  BLM also claims that some marginal wells might be prematurely shut-in due to the costs and uncertainties involved in obtaining an exemption.

116.    BLM relies entirely on a new, nontransparent analysis of marginal wells that was not available for public comment.  In its new Regulatory Impact Analysis for the Rescission Rule (2018 RIA), BLM purports to calculate, for the first time, "the per-well reduction in revenue from the costs imposed by the requirements in the 2016 rule."  BLM provides no information on the various cost assumptions for their calculations, including "lifting costs" or the "total" and "annualized" costs of the 2016 rule, nor does BLM even explain for what "select requirements" from the 2016 rule it is assessing costs.

117.    BLM also fails to meaningfully explain why it discounted contrary evidence that the Waste Prevention Rule would have a limited impact on marginal wells, including but not limited to

Complaint for Declaratory and Injunctive Relief
Case No. 3:18-cv-5984                                                                                              25

two analyses the Conservation and Tribal Citizen Groups provided in their comments. The first, by MJ Bradley and Associates in 2018, showed that the decision as to whether or not to shut-in a well is based not on revenue, but primarily on well production numbers, which are unaffected by compliance costs. The second, by the Conservation Economics Institute in 2016, found that the Waste Prevention Rule would not impose a significant cost burden on marginal wells.

118. Nor does BLM tailor the Rescission Rule to address any specific concerns about marginal wells. Instead, it eliminates the leak detection and repair and pneumatic equipment requirements for all wells.

119. Nor does BLM tailor the Rescission Rule to its own definition of waste. For example, under BLM's new definition, the continued use of high-bleed pneumatics devices constitutes waste. BLM acknowledges that the Waste Prevention Rule's requirement to replace high-bleed pneumatic controllers with low-bleed devices would impose costs of about $12 to 13 million over 10 years and generate costs savings from product recovery of $20 to 26 million over the same timeframe. BLM nevertheless rescinds that requirement, in part because it anticipates that operators will voluntarily replace pneumatic controllers where it is profitable to do so.

120. In a 180-degree change in position from its 2016 conclusions, BLM finds that uniform federal standards are not necessary and that existing EPA and state regulations in combination with a backstop similar to NTL-4A are sufficient to prevent waste. But BLM fails to explain how a return to what was essentially the regulatory status quo prior to its adoption of the Waste Prevention Rule will not lead to the same emission levels that it previously deemed "unacceptably high." Nor does it explain how widely different state and tribal rules constitute "*all* reasonable precautions to prevent waste."

121. In the Rescission Rule, BLM claims that the Waste Prevention Rule created unnecessary regulatory overlap with EPA and state regulations. But BLM ignores the fact that EPA and state regulations do not address most oil and gas wells on federal and tribal leases. For example, Conservation and Tribal Citizen Groups provided a recent analysis showing that more than 80% of wells subject to the Waste Prevention Rule are not subject to EPA or state leak detection standards.

Complaint for Declaratory and Injunctive Relief
Case No. 3:18-cv-5984                                                                                26

122. In the Rescission Rule, BLM claims that operators will eventually replace existing sources with new sources, which will be subject to EPA regulations. But BLM fails to address whether it is consistent with its Mineral Leasing Act obligations to allow waste to continue for seven years (in the case of pneumatic controllers). Nor does BLM acknowledge—much less explain—the significance of EPA's recent proposal to substantially weaken its regulations for new sources.

123. For venting and flaring of gas from oil wells, the Rescission Rule delegates BLM's authority to regulate waste to the states. BLM explains that 43 C.F.R. § 3179.201(a) "establishes State or tribal rules, regulations, and orders as the prevailing regulations for the venting and flaring of oil-well gas on BLM-administered leases." 83 Fed. Reg. at 49,202. BLM maintains no authority to enforce any such applicable state regulations on federal land. BLM also fails to address its previous conclusion in 2016 that such wholesale delegation to the states is impermissible.

124. In the Rescission Rule, BLM analyzes existing regulations in the ten top producing federal oil and gas states, and finds that they have statutory or regulatory provisions addressing venting and flaring that "are expected to constrain the waste of associated gas from oil wells." *Id.* BLM concedes that the regulations that it analyzed vary from state to state and that many are not as stringent as the Waste Prevention Rule, but still concludes that they constitute "reasonable precautions" to prevent waste. BLM reaches this conclusion without, however, assessing the efficacy of each state's regulations to reduce methane waste. BLM also fails to explain how its conclusion squares with its 2016 conclusion that the same state regulations were inadequate to prevent waste, and the Mineral Leasing Act's mandate that BLM require operators to use "*all* reasonable precautions to prevent waste."

125. Where states or tribes do not have venting or flaring regulations, the Rescission Rule reverts to a system "similar" to NTL-4A. BLM fails to address its own previous findings that NTL-4A was not effective and led to volumes of waste that BLM deemed unacceptably high. Indeed, BLM does not even mention the two GAO reports documenting massive and preventable waste of publicly-owned natural gas that triggered the Waste Prevention Rule in the first place. BLM also ignores other problems with NTL-4A that it identified in 2016, and were identified in the GAO reports. For example, the Rescission Rule does not address the burden imposed on BLM and

Complaint for Declaratory and Injunctive Relief
Case No. 3:18-cv-5984                                                                        27

operators to file and process individualized flaring applications.  Nor does it address the problem of inconsistent application by different field offices.

126.    BLM relies on a new 2018 RIA to support the Rescission Rule.  In contrast with the 2016 RIA, the 2018 RIA concludes that the Waste Prevention Rule's costs outweigh its benefits.  However, the 2018 RIA underestimates the Waste Prevention Rule's benefits and overestimates its costs.

127.    The primary change to the 2018 RIA is that it relies on a new "interim" estimate of the social cost of methane that diverges sharply from the Interagency Working Group-approved estimate that BLM used to evaluate the Waste Prevention Rule.  This interim estimate, which was developed with none of the rigor of the Interagency Working Group-approved estimate, including peer review and public comment, cuts the Waste Prevention Rule's projected social benefits by up to 96%.

128.    BLM relies upon the hastily-assembled "interim" estimate it has been using since early 2017 without explaining whether it is undergoing any process to finalize this "interim" estimate, what that process comprises, and when it expects that process to be complete.

129.    The new interim social cost of methane rests on two fundamental changes.  First, it purports to exclude all costs from harms that occur outside of the United States.  BLM does not acknowledge that the National Academies and the Interagency Working Group have concluded that no good methodologies exist for excluding non-domestic harms.  BLM also fails to acknowledge that because of the global economy's highly integrated nature, the international impacts of climate change will inevitably spill over into the United States, creating *domestic* harms.  BLM has no answer to comments pointing out these domestic harms in its final rule; instead, it simply ignores this important aspect of the problem.  BLM fails to explain its disregard for this evidence or its prior reliance on the social cost of methane that was not so limited.

130.    Second, the 2018 RIA relies on a higher range of discount rates to calculate lost benefits from reductions of methane emissions than the central estimate discount rate BLM relied upon to calculate the same benefits in the Waste Prevention Rule.  In the 2018 RIA, BLM calculated the range of benefits from reductions of methane emissions at discount rates of 7% and 3%, rather

Complaint for Declaratory and Injunctive Relief
Case No. 3:18-cv-5984                                                                                                 28

than relying on the 3% discount rate it used for the calculating the same benefits in the Waste Prevention Rule.  BLM explained in the Waste Prevention Rule rulemaking that it used a 3% discount rate because it was the estimate deemed to be "central" by the Interagency Working Group, which evaluated the social cost of methane at model averages using a 2.5%, 3%, and 5% discount rates, along with the 95th percentile of the pooled estimates from all social cost of methane models and scenarios using a 3% discount rate.  BLM's change to considering a range of discount rates between 3% and 7% is contrary to expert consensus and Office of Management and Budget guidance on discounting for policies with long-term, intergenerational benefits, which are appropriately evaluated using lower discount rates.  BLM does not explain why a 7% discount rate is more appropriate than lower discount rates.

131.    In the 2018 RIA, BLM also ignores the Waste Prevention Rule's health and safety benefits, including air quality benefits from reducing VOCs and hazardous air pollutants, reducing noise and light pollution from flaring, and improvements to worker safety.  Other agencies routinely monetize public health benefits.  BLM does not explain its failure to do so.

132.    BLM also overestimates the Rescission Rule's compliance cost reductions in the 2018 RIA by assuming that no operators have taken any steps to comply with the Waste Prevention Rule prior to 2019.  The Waste Prevention Rule took effect in January 2017, and all of its requirements have been in effect at some point.  Operators have also indicated that they are complying.  Many of the Waste Prevention Rule's compliance costs are capital investments in equipment upgrades.  BLM does not consider in the 2018 RIA whether companies have already made these capital investments or taken steps to implement leak detection and repair, which would lessen the Rescission Rule's compliance cost reductions.

133.    BLM also makes unexplained and unsupported changes to its estimates of the Waste Prevention Rule's cost and benefits in its new 2018 RIA.  The 2018 RIA's cost and benefit estimates differ from those found in the draft RIA from the proposed Rescission Rule, as well as the 2016 RIA.  As a result, the public could not comment on either the basis for or appropriateness of these changes.

Complaint for Declaratory and Injunctive Relief
Case No. 3:18-cv-5984                                                                                                    29

134.    For example, without any explanation of the basis for the changes, the 2018 RIA nearly doubles the estimates of the Waste Prevention Rule's "administrative burden" to industry.

135.    Similarly, in 2016 BLM estimated the Waste Prevention Rule would deliver $860 million in cost savings from the sale of captured natural gas between 2019 and 2026.  But in 2018 RIA, BLM estimates costs savings over that same time period as only $654 million.  BLM does not explain this change.

136.    In the 2018 RIA, BLM estimates that the Rescission Rule will result in lost royalties of $28.3 million (net present value using a 7% discount rate) or $79.1 million (net present value using a 3% discount rate).  In contrast, in the 2016 RIA, BLM estimated that the Waste Prevention Rule would increase royalties by $65 million (using a 7% discount rate) or $82 million (using a 3% discount rate).  The 2018 RIA fails to fully explain these differences.

## IV.    BLM's Cursory NEPA Analysis Overlooks the Rescission Rule's Significant Climate and Air Quality Impacts.

137.    BLM supports the Rescission Rule with, excluding appendices, a 26-page EA.  BLM concludes that the Rescission Rule has no "significant" impacts in a FONSI.  It therefore did not prepare an EIS.

138.    BLM did not make any substantive changes to the EA in response to public comments.

139.    The EA acknowledges that the Rescission Rule will cause additional emissions of 175,000 to 180,000 tons per year of methane, 79,000 to 80,000 tons per year of VOCs, and 1,860 to 2,030 tons per year of hazardous air pollutants over the ten-year evaluation period.  Although the EA quantifies these increased emissions, BLM does not analyze how those increased emissions would impact human health and the environment.

140.    The EA's entire consideration of the Rescission Rule's public health impacts from increased air pollution is contained in one sentence.  "These air pollutants affect the health and welfare of humans, as well as the health of plant and wildlife species."

141.    The EA's discussion of the Rescission Rule's noise and light impacts from increased flaring also consists of one sentence.  "We would expect additional flaring under the [Rescission

Complaint for Declaratory and Injunctive Relief
Case No. 3:18-cv-5984                                                                                      30

Rule], thereby increasing noise and light pollution and potentially affecting the communities living near oil and gas development, wildlife, night-sky resources, and recreationists."

142.    The EA does not discuss the Rule's impacts on low-income and minority populations living near oil and gas operations, including tribal communities.  Yet, it concludes that these impacts will not be significant.

143.    BLM fails to consider the Rescission Rule's impacts in regions that are already suffering from air quality problems, such as ozone pollution.  Ground-level ozone is a dangerous air pollutant that causes or contributes to asthma, cardiovascular disease, and even premature mortality.  VOCs and nitrogen oxides emitted by oil and gas development contribute to ozone formation.

144.    BLM manages leases in numerous areas of the country that are already suffering from elevated ozone levels, and in some cases areas are already violating public health standards.  For example, the Uinta Basin in Utah has a substantial number of BLM-managed leases.  EPA has designated this area as out of compliance with federal ozone standards.  BLM does not examine the public health impact of the Rescission Rule in areas suffering from ozone pollution.

145.    Conservation and Tribal Citizen Groups submitted data indicating that there are currently more than 6,000 BLM-managed wells in areas that are not meeting federal standards for ozone, and which are not subject to EPA or state leak detection requirements.  BLM did not evaluate this data in the EA.

146.    BLM also fails to consider the Rescission Rule's impacts on people living near BLM-managed leases, especially in tribal communities.  For example, residents of the Fort Berthold Reservation in North Dakota and the Navajo Nation and other tribes in northwestern New Mexico often live in close proximity to oil and gas development.  Many tribal communities adversely affected by oil and gas development already suffer disproportionately high levels of negative health effects.

147.    The Waste Prevention Rule also would have controlled emissions of hazardous air pollutants, including carcinogens like benzene, that pose significant health threats to these communities.  These communities also must grapple with noise and light pollution from flaring.

Complaint for Declaratory and Injunctive Relief
Case No. 3:18-cv-5984                                                                                                  31

148. The Rescission Rule's impacts on tribal lands will be significant. Tribal lands are subject only to BLM and tribal standards. No tribe has air quality regulations as strong as the Waste Prevention Rule.

149. The EA does not consider the Rescission Rule's impacts in combination with any other past, present, or reasonably foreseeable actions. For example, the EA fails to consider the cumulative public health impacts of the Rescission Rule and other Trump administration efforts to rescind important public health protections, particularly EPA's planned revision of its oil and gas air quality rules. Although BLM acknowledges that EPA has proposed to weaken its new source performance standards for oil and gas sources, the EA's environmental analysis assumes those standards will remain in place.

150. The EA also fails to consider the Rescission Rule's impacts on climate change. For example, the EA fails to consider the localized impact of increased methane emissions in the San Juan Basin, which is a methane "hot spot." Studies have indicated that oil, gas, and coalbed methane emissions in the region are a leading cause of the hot spot.

151. The EA acknowledges the Rescission Rule will increase methane emissions by 175,000 tons in the first year. BLM states that this is 0.61% of total U.S. methane emissions in 2015. However, BLM provides no other context for the foregone emission reductions. In fact, they have the climate impact of nearly 3 million passenger vehicles driving for a year or nearly 1.5 million homes' energy use for one year.

152. BLM further fails to disclose the carbon dioxide equivalent of the foregone emission reductions using the global warming potential of methane over both a 20-year and 100-year timeframe. Global warming potential values allow BLM to estimate how many tons of carbon dioxide would be needed to produce the same amount of global warming as one ton of methane. Based on the Intergovernmental Panel on Climate Change's Fifth Assessment Report, published in 2014, methane has a global warming potential of 36 over a 100-year period and 87 over a 20-year period.

153. In order to determine that foregone emissions are 0.61% of total U.S. methane emissions, BLM had to calculate the carbon dioxide equivalent of foregone emission reductions. In

Complaint for Declaratory and Injunctive Relief
Case No. 3:18-cv-5984                                                                  32

doing so, however, BLM used an outdated value from the Intergovernmental Panel on Climate Change's Fourth Assessment Report, published in 2007, and failed to analyze or provide final carbon dioxide equivalent values to inform the public and decisionmakers using both 20-year and 100-year global warming potentials provided by the 2014 Fifth Assessment Report.

154. BLM also fails to assess the cumulative impacts of the Rescission Rule's methane emissions in combination with the direct and indirect emissions of the federal and Indian oil and gas program as a whole. There are more than 100,000 federal onshore oil and gas wells, which account for about 11% of the United States' natural gas supply and about 5% of its oil supply. In Fiscal Year 2015, federal oil and gas wells produced 183.4 million barrels of oil, 2.2 trillion cubic feet of natural gas, and 3.3 billion gallons of natural gas liquids. Between 2003 and 2014, approximately 25% of all U.S. and 3–4% of global fossil fuel greenhouse gas emissions were attributable to federal coal, oil, and gas resources leased and developed by the Department of the Interior.

155. BLM does not quantify the cumulative greenhouse gas emissions caused by the Rescission Rule's increase in methane emissions when combined with the direct emissions caused by oil and gas production on federal and Indian leases as well as indirect, downstream emissions caused by the transportation, processing, and use of oil and natural gas produced from those federal and Indian leases. Nor did BLM evaluate the cumulative impact of those emissions to climate change, despite the availability of tools, such as but not limited to the social cost of carbon and methane, the global warming potential of methane over both 20-year and 100-year time frames, and carbon budgets, to do so.

156. BLM also fails to evaluate the impacts of climate change to public and tribal lands. The EA states that BLM "would anticipate additional [greenhouse gas] emissions, which would have climate impacts and air quality impacts." But the EA contends that the Rescission Rule's "impacts on climate change cannot be reliably assessed and are sufficiently uncertain as to be not reasonably foreseeable." The EA's contention is conclusory and, further, ignores the wealth of available scientific data regarding both the current and reasonably foreseeable future impacts of climate change on Western landscapes, including extreme weather, forest fires, and drought as well as adverse impacts on air quality, public health, public lands, and biodiversity.

Complaint for Declaratory and Injunctive Relief
Case No. 3:18-cv-5984                                                                                          33

157.    The EA also fails to consider other available metrics for assessing the impacts of the Rescission Rule with respect to climate change.  Despite previously relying on a global value for the social cost of methane, BLM now impermissibly attempts to limit the scope of its analysis to the effects occurring only in the United States, ignoring both global impacts as well as the international impacts of climate change that spill over into the United States, creating *domestic* harms.  BLM also arbitrarily discounts the present value of climate impacts by relying on a higher range of discount rates than it did when evaluating the Waste Prevention Rule.

158.    Despite BLM's failure to take a hard look at the Rescission Rule's air pollution and climate change impacts, the FONSI concludes that they are not significant.

159.    The FONSI admits there will be increased emissions of air pollutants and greenhouse gases, but it concludes the impacts on public health and safety are not significant because the emissions would be geographically dispersed and would occur in sparsely populated areas.  As record evidence demonstrates, however, even minor increases of pollution geographically dispersed across sparsely populated areas can cause significant climate, air quality, and public health impacts. BLM ignores the significant health impacts to a large number of people living in areas impacted by oil and gas development on federal and tribal leases.

160.    The FONSI also concludes that the Rescission Rule's impacts are not significant because they do not threaten a violation of Federal, State, or local law or requirements imposed for the protection of the environment.  Despite its concession that the Rescission Rule will result in foregone air quality benefits, the FONSI claims that the Rescission Rule cannot threaten requirements imposed for the protection of the environment because the purpose of the Waste Prevention Rule was to prevent waste and not to protect the environment.  The FONSI ignores that the Rescission Rule will contribute to ozone pollution in areas that are already violating EPA's National Ambient Air Quality Standards for ozone.

161.    The FONSI ignores the significant impacts of climate change on public health and the environment, particularly federal public lands and tribal lands, claiming those impacts "cannot be reliably assessed and thus are sufficiently uncertain as to be not reasonably foreseeable."

Complaint for Declaratory and Injunctive Relief
Case No. 3:18-cv-5984                                                                                    34

162.    The FONSI claims that the Rescission Rule "is not related to any other BLM actions with individually insignificant but cumulatively significant impacts."  The FONSI ignores the cumulative climate impacts of the Rescission Rule in combination with BLM's oil and gas leasing program.  The FONSI also ignores other actions taken by federal agencies that will also increase air pollution and greenhouse gas emissions from oil and gas development, including EPA's plans to weaken its new source performance standards.

163.    Despite the overwhelming public comments in support of retaining the Waste Prevention Rule, which included extensive comments on BLM's failure to adequately consider the environmental impacts, the FONSI concludes that "BLM's analysis of the environmental effects of the reversal of the 2016 rule should not be in contention."  The FONSI also fails to recognize the considerable dispute about BLM's characterization of the impacts of the Rescission Rule using the new "interim" social cost of carbon rather than the Interagency Working Group-approved estimate that BLM used to evaluate the Waste Prevention Rule, which was subject to peer review and public comment.

164.    In the EA, BLM defines the purpose and need for the Rescission Rule based on its unsupported finding that the Waste Prevention Rule would unnecessarily encumber energy production, constrain economic growth, and prevent job creation.  The EA defines the purpose and need as "eliminat[ing] unnecessary regulatory requirements in order to more efficiently manage oil and gas operations on Federal and Indian lands."

165.    BLM considers three alternatives in detail within the EA: (1) continued implementation of the Waste Prevention Rule (the no action alternative), (2) the Rescission Rule, and (3) retaining the gas capture requirements.

166.    BLM identifies three additional middle-ground alternatives, but eliminates them from further discussion without any analysis.  These alternatives included: (1) streamlining the waste minimization plan requirement, (2) retaining but adjusting the capture percentage framework for reducing flaring, and (3) retaining the leak detection, pneumatic controller, storage tank and other operational and equipment requirements, but applying them only to specific categories of wells—

wells that sell gas to market, wells that would receive positive returns from compliance, and wells that are not marginal.

167. Each of these alternatives would have addressed, to some degree, concerns that BLM identified in the proposed Rescission Rule. But BLM rejected these alternatives from further analysis without sufficient analysis or support. For example, BLM fails to explain how applying the rule only to wells that would receive positive returns from compliance would not eliminate what the agency deems "unnecessary regulatory burdens."

168. BLM also rejected additional reasonable alternatives recommended by the public, such as controls on the timing and location of development, designed to facilitate the reduction of methane waste.

### FIRST CLAIM FOR RELIEF
(*Failure to Take All Reasonable Precautions to Prevent Waste and Protect Public Welfare and the Environment: Violation of the Mineral Leasing Act, FLPMA, and APA*)

169. The allegations in paragraphs 1–168 are incorporated herein by reference.

170. Under the Mineral Leasing Act, BLM has a duty to ensure that companies developing publicly owned oil and gas "use all reasonable precautions to prevent waste of oil or gas." 30 U.S.C. § 225. Likewise, the Mineral Leasing Act requires that each federal lease "shall contain provisions for the purpose of insuring the exercise of reasonable diligence, skill, and care in the operation of said property . . . and for the prevention of undue waste." *Id.* § 187.

171. In undertaking its duties under the Mineral Leasing Act, BLM must also provide for the "protection of the interests of the United States . . . and for the safeguarding of the public welfare." *Id.* BLM is empowered to "prescribe necessary rules and regulations" and "do any and all things necessary" to carry out these purposes. *Id.* § 189.

172. BLM adopted the 2016 Waste Prevention Rule to fulfill these legal mandates. Based on an extensive record, BLM required reasonable protective measures that are similar to measures some oil and gas operators have used for years and that some states have required through regulations.

Complaint for Declaratory and Injunctive Relief
Case No. 3:18-cv-5984                                                                                  36

173.    The 2018 Rescission Rule eliminates many of these reasonable protections.  To the extent BLM provides any explanation for why these measures are no longer reasonable, it does so by redefining waste to include only vented, flared, or leaked natural gas that is profitable for industry to capture.  The Rescission Rule adds a new definition of "waste of oil or gas" to include only those measures "where compliance costs are not greater than the monetary value of the resources they are expected to conserve."  43 C.F.R. § 3179.3.  This definition of waste reads the duty to prevent waste out of the Mineral Leasing Act and focuses exclusively on private interests to the exclusion of "the interests of the United States" and the "public welfare."

174.    Furthermore, BLM failed to explain how the Rescission Rule's new definition of waste is permissible under its governing statutes.  *Fox Television*, 556 U.S. at 514–16; 5 U.S.C. § 706(2)(A).  BLM fails to explain how the Rescission Rule's new definition of waste comports with its statutory duties to protect the interests of the United States and the public welfare under the Mineral Leasing Act, 30 U.S.C. § 187, and to manage the public lands "in a manner that will protect the quality of the . . . scenic . . . environmental, [and] air and atmospheric . . . values" and "prevent unnecessary or undue degradation" under FLPMA, 43 U.S.C. §§ 1701(a)(8), 1732(b).  Indeed, BLM ignores its obligations to protect the public welfare and the environment altogether.

175.    BLM's exclusive focus on private interests in the Rescission Rule's definition of waste also represents an unexplained and unsupported change in position from BLM's position as contained in the Waste Prevention Rule in violation of the APA.  *Fox Television*, 556 U.S. at 514–16; 5 U.S.C. § 706(2)(A).

176.    Alternatively, even if BLM's new definition of waste were permissible, the Rescission Rule violates the Mineral Leasing Act because it allows waste to continue even under its own new definition.  30 U.S.C. §§ 187, 225; 5 U.S.C. § 706(2)(A).

177.    Specifically, BLM concedes that the Waste Prevention Rule's requirement to use low-bleed continuous pneumatic controllers "would have imposed costs of about $12 million to $13 million and would have generated cost savings from product recovery of $20 million to $26 million," and thus was "expected to generate revenue for operators."  83 Fed. Reg. at 49,195.  Nonetheless, the Rescission Rule rescinds the requirement because BLM anticipates that operators

will voluntarily use low-bleed pneumatic controllers. BLM's treatment of pneumatic controllers demonstrates that its new definition of "waste of oil and gas" is only a pretense, and BLM's true aim is not to impose *any* reasonable precautions to prevent waste (much less "all"), as it will decline to regulate regardless of whether the requirement meets its new definition.

178.    The Rescission Rule's new definition of waste, as well as the Rule's allowance for continued waste that conflicts with even that definition, is contrary to the Mineral Leasing Act's plain language and purpose, 30 U.S.C. §§ 187, 225, and is not in accordance with law in violation of the APA, 5 U.S.C. §§ 706(2)(A), (C), (D).

## SECOND CLAIM FOR RELIEF
*(Illegal Reliance on State Standards: Violation of the Mineral Leasing Act, FLPMA, and APA)*

179.    The allegations of paragraphs 1–168 are incorporated herein by reference.

180.    The Mineral Leasing Act directs the Secretary of the Interior to oversee the leasing and development of publicly owned minerals, including the mandate to ensure operators "use all reasonable precautions to prevent waste of oil or gas." 30 U.S.C. § 225; *see also id.* §§ 181, 187, 189. FLPMA further grants the Secretary exclusive control over the management and protection of public lands. *See* 43 U.S.C. §§ 1701(a)(1), (5), 1702(e), 1731(b), 1732(a), (b), 1740. Neither the Mineral Leasing Act nor FLPMA authorize the Secretary to delegate his authority to state governments, nor is there any evidence that Congress intended to allow such delegation.

181.    In the Rescission Rule, BLM abdicates its statutory responsibility, providing that oil wells may vent or flare gas royalty free "if it is vented or flared pursuant to applicable rules, regulations, or orders of the appropriate State regulatory agency or tribe." 43 C.F.R. § 3179.201. BLM states that this provision "establishes State or tribal rules, regulations, and orders as the prevailing regulations for the venting and flaring of oil-well gas on BLM administered leases." 83 Fed. Reg. at 49,202. BLM maintains no authority to enforce any such applicable state or tribal regulations on federal land. Nor is there anything in the regulation to prevent or address the prospect of states from altering or weakening their standards inconsistent with the Mineral Leasing Act or FLPMA.

182.    Under § 3179.201, any state regulation or order that applies to venting or flaring is

Complaint for Declaratory and Injunctive Relief
Case No. 3:18-cv-5984                                                                                    38

deemed sufficient to meet BLM's legal obligations under the Mineral Leasing Act and FLPMA. However, BLM has not analyzed whether the relevant state standards conform to BLM's federal statutory obligations, including but not limited to the obligations to ensure operators "use all reasonable precautions to prevent waste of oil or gas," 30 U.S.C. § 225, and to "prevent unnecessary or undue degradation of the [public] lands," 43 U.S.C. § 1732(b).  Instead, BLM only prepared a cursory 6-page memorandum that provides a short summary of each state's rules and standards, but does not analyze the effectiveness of these standards.

183.    BLM recognizes that it has an independent obligation to ensure that operators use all reasonable precautions to prevent waste when it concedes that if a state "were to propose a relaxation of [its] restrictions on flaring, and the BLM judged that it allowed for undue waste of Federal gas, then the BLM would move swiftly to amend § 3179.201 to preclude deference to that State's flaring regulations."  83 Fed. Reg. at 49,203.  But BLM does not explain how each of the widely varying current state and tribal standards constitutes "*all* reasonable precautions to prevent waste."  Nor does it explain how its conclusion that the current state and tribal standards represent "all reasonable precautions" can be true in light of the GAO reports' and its own prior finding of enormous quantities of preventable gas waste.

184.    BLM also fails to explain its change in position from recognizing that it had an independent legal responsibility to ensure compliance with uniform federal standards to deferring completely to varying state standards.

185.    BLM also fails to explain and support its change in position with respect to its earlier finding, supported by a factual analysis, that existing state regulations are inadequate to fulfill BLM's independent mandate.

186.    BLM's decision to delegate its statutory obligations to states violates the Mineral Leasing Act and FLPMA, and is arbitrary and capricious and in excess of statutory authority in violation of the APA.  5 U.S.C. §§ 706(2)(A), (C), (D).  BLM's reliance on state and tribal regulations also represents an unexplained and unsupported change in position in violation of the APA.  *Id.* §§ 706(2)(A), (D); *Fox Television*, 556 U.S. at 515–16.

**THIRD CLAIM FOR RELIEF**
*(Arbitrary Revision of the Waste Prevention Rule:  Violation of the APA)*

187.    The allegations in paragraphs 1–168 are incorporated here by reference.

188.    Under the APA, when a federal agency implements substantive revisions to a final, effective regulation, it must show there are "good reasons" for changing the rule and offer a "reasoned explanation" for its changed position.  *Fox Television,* 556 U.S. at 514–16.  Where a "new policy rests upon factual findings that contradict those which underlay its prior policy," a "more detailed justification" is required.  *Id.* at 515

189.    BLM's reasons for rescinding or modifying the provisions of the Waste Prevention Rule fail to meet the APA standards.  For example, BLM fails to offer a reasoned explanation for changing its finding that the Waste Prevention Rule's requirements were "economical, cost-effective, and reasonable."  81 Fed. Reg. at 83,009.  Indeed, BLM's claim that the Waste Prevention Rule's provisions "add[] regulatory burdens that unnecessarily encumber energy production, constrain economic growth and prevent job creation," 83 Fed. Reg. at 49,184, contradicts BLM's prior conclusions, its own analysis in the Rescission Rule, and other evidence before the agency.

190.    BLM further fails to offer any good reasons or a reasoned explanation for changing its findings with respect to the impact of the Waste Prevention Rule on marginal wells.  BLM offers no support for its claim that the Waste Prevention Rule's requirements will impose a burden on marginal wells beyond a novel and nontransparent comparison of marginal well revenue to compliance costs, that was not available for public comment (addressed in the Fourth Claim for Relief).  Likewise, BLM offers no evidence that the costs and uncertainties involved in obtaining an exemption would cause operators to shut in wells prematurely.  *Id.* at 49,187, 49,206.  Indeed, BLM ignored evidence submitted by Conservation and Tribal Citizen Groups to the contrary.  BLM also arbitrarily failed to tailor the Rescission Rule to address this concern.

191.    BLM fails to provide a reasoned explanation for reversing its finding that EPA air quality regulations and state regulations (addressed in Second Claim for Relief) do not obviate the need for BLM waste regulations.  BLM fails to explain how its reliance on EPA regulations is permissible to meet its independent statutory obligations to prevent waste, particularly because EPA

Complaint for Declaratory and Injunctive Relief
Case No. 3:18-cv-5984                                                                                          40

has announced plans to revise or even rescind its regulations, important factors that BLM ignores. BLM also fails to explain its change in position from previously concluding that BLM regulations are necessary because EPA regulations do not address existing source emissions, and fails to explain how allowing waste to continue from existing sources is permissible under the Mineral Leasing Act.

192.     BLM fails to provide a reasoned explanation for reversing its finding that the NTL-4A framework is not effective and led to impermissible waste, and that it was necessary to replace NTL-4A to reduce burdens on BLM and operators, and inconsistent application by various field offices.  BLM fails to acknowledge the factual findings underpinning the Waste Prevention Rule including the conclusions of the GAO reports, much less provide a detailed explanation for why these factual findings were erroneous or it should change policy notwithstanding these findings.

193.     In adopting the Rescission Rule, BLM also omits consideration of relevant factors and data, relies on factors which Congress did not intend the agency to consider, and offers rationales that are unsupported or run counter to the evidence in the administrative record, lack a rational basis, represent unexplained and unsupported changes in position, and are otherwise arbitrary and capricious in violation of the APA.  5 U.S.C. § 706(2)(A).

### FOURTH CLAIM FOR RELIEF
*(Arbitrary Assessment of Costs and Benefits:  Violation of the APA and Failure to Provide for Meaningful Public Comment)*

194.     The allegations in paragraphs 1–168 are incorporated here by reference.

195.     BLM relies on its reassessment of the costs and benefits of the Waste Prevention Rule to justify the Rescission Rule, but it arbitrarily underestimates the benefits and overstates the costs of the Waste Prevention Rule.

196.     BLM dramatically reduces the benefits of the Waste Prevention Rule by relying on an "interim" social cost of methane that fails to consider significant domestic and global impacts.  BLM fails to offer good reasons for relying on this new "interim" estimate, which relies on methodologies that are unsupported in the record and contrary to expert consensus.  BLM also fails to explain and support the "interim" changes to the social cost of methane estimate, including its choice to present a

Complaint for Declaratory and Injunctive Relief
Case No. 3:18-cv-5984                                                                               41

discounted range of estimates of climate impacts that undervalue the future effects of climate change.

197.    While BLM focuses on costs of the Waste Prevention Rule, it arbitrarily fails to monetize or adequately consider the public health and worker safety benefits of the Waste Prevention Rule (or, correspondingly, costs of the Rescission Rule).

198.    BLM arbitrarily overstates the compliance cost reductions associated with the Rescission Rule by assuming, with no support, that operators have taken no steps to comply with the Waste Prevention Rule.

199.    BLM also fails to adequately explain changes to the estimates of cost savings and administrative burdens provided by the Waste Prevention Rule.

200.    BLM argues that the Rescission Rule is necessary based on concerns that the requirements of the Waste Prevention Rule would cause operators to prematurely shut-in marginal wells.  In the Rescission Rule, BLM relies on a new and nontransparent "additional quantitative analysis" of revenue at marginal wells to support these concerns.  This novel analysis was not presented for public comment on the Rescission proposal, and contradicts analysis presented by Conservation and Tribal Citizen Groups, and disregarded by BLM, that shut-ins at marginal wells are not associated with well revenue, but rather well production.

201.    BLM's assessment of the costs and benefits of the Waste Prevention Rule and Rescission Rule omits consideration of relevant factors and data, relies on factors which Congress did not intend the agency to consider, and offers rationales that are unsupported or run counter to the evidence in the administrative record, lack a rational basis, represent unexplained and unsupported changes in position, and are otherwise arbitrary and capricious in violation of the APA.  5 U.S.C. §§ 706(2)(A), (C), (D); *Fox Television,* 556 U.S. at 514–16.

202.    BLM's failure to explain changes in its assessment methodology for its cost benefit analysis and its inclusion of a novel "analysis" of marginal well revenue also rendered the opportunity for public comment meaningless.  *See* 5 U.S.C. § 553.

**FIFTH CLAIM FOR RELIEF**
*(Failure to Take a "Hard Look" at Environmental Impacts and Environmental Justice Concerns: Violation of NEPA)*

203.    The allegations in paragraphs 1–168 are incorporated herein by reference.

204.    NEPA is our "basic national charter for protection of the environment."  40 C.F.R. § 1500.1(a).  The Act makes environmental protection a part of the mandate of every federal agency.

205.    NEPA is intended "to foster excellent action" and "to help public officials make decisions that are based on [an] understanding of environmental consequences, and take actions that protect, restore, and enhance the environment."  *Id.* § 1500.1(c).

206.    To that end, NEPA requires federal agencies to take a "hard look" at the environmental impacts of proposed actions before the agency makes an irreversible and irretrievable commitment of resources.  42 U.S.C. § 4332; 40 C.F.R. §§ 1500.1, 1508.9.  NEPA requires agencies to use high quality, accurate scientific information and to ensure the scientific integrity of the analysis.  40 C.F.R. §§ 1500.1(b), 1502.24.

207.    Agencies must consider the direct, indirect, and cumulative impacts of their actions. *Id.* §§ 1502.15, 1508.7, 1508.8, 1508.25(c).  Direct impacts are those impacts "caused by the action and [that] occur at the same time and place." *Id.* § 1508.8.  Indirect impacts are "caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable." *Id.* Cumulative impacts are "the impact[s] on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time." *Id.* § 1508.7.

208.    When an agency has "incomplete or unavailable information" about the reasonably foreseeable impacts of a project, the agency must determine whether it can reasonably obtain the missing information. *Id.* § 1502.22.  If not, the agency must acknowledge that information is incomplete or unavailable, discuss its relevance for evaluating the impacts of the action, summarize existing credible information, and apply any "theoretical approaches or research methods generally accepted in the scientific community." *Id.* § 1502.22(b). The agency must analyze "impacts which

have catastrophic consequences, even if their probability of occurrence is low, provided that the analysis of the impacts is supported by credible scientific evidence, is not based on pure conjecture, and is within the rule of reason." *Id.*

209.    NEPA requires federal agencies to prepare an EIS for all "major Federal actions significantly affecting the environment." 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1501.4. To assess whether impacts are significant, an agency may prepare an EA. If an agency determines through the preparation of an EA that no EIS is required, it must document that finding in a FONSI that supplies a convincing statement of reasons explaining why a proposed action's impacts are insignificant. 40 C.F.R. § 1508.9. An EIS must be prepared if there are substantial questions that the proposed action may cause significant degradation of the environment.

210.    To determine whether an action has significant environmental impacts, an agency must consider both the context and intensity. An agency must evaluate the impact of an action in all relevant contexts, including global, national, and local. *Id.* § 1508.27(a); *see also* 42 U.S.C. § 4332(2)(F) (directing agencies to "recognize the worldwide and long-range character of environmental problems"). In evaluating intensity, the agency must consider the following, among other factors:

- "[t]he degree to which the proposed action affects public health or safety,"
- "[t]he degree to which the effects on the quality of the human environment are likely to be highly controversial,"
- "possible effects on the human environment are highly uncertain or involve unique or unknown risks,"
- "whether the action is related to other actions with individually insignificant but cumulative significant impacts," and
- "[w]hether the action threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment."

40 C.F.R. § 1508.27.

211.    In addition to NEPA's requirements, Executive Order 12,898 (Feb. 16, 1994) requires federal agencies to incorporate environmental justice as part of their missions. The Council on Environmental Quality (CEQ), the agency charged with implementing NEPA, has issued guidance for agencies on implementing Executive Order 12,898 in NEPA analyses. *See* CEQ, Environmental Justice Guidance Under the National Environmental Policy Act (Dec. 10, 1997). The guidance

instructs agencies to consider whether there may be disproportionately high and adverse human health or environmental effects on minority populations, low-income populations, or Indian Tribes.

212. BLM failed to take a hard look at the Rescission Rule's direct, indirect, and cumulative impacts on climate, public health, and local communities, including disproportionately affected tribal communities.

213. The EA ignores the impacts of increasing VOC emissions in areas already suffering from unhealthy ozone pollution or the impacts of increased pollution on local communities. The EA also fails to consider the environmental justice implications of increasing pollution in tribal communities. The EA further fails to consider these public health impacts in combination with other past, present, or reasonably foreseeable actions, including EPA's planned revisions of its oil and gas air quality regulations.

214. BLM failed to take a hard look at the Rescission Rule's direct, indirect, and cumulative climate impacts from increased methane emissions. The EA fails to consider the Rescission Rule's impacts to specific geographies with existing, high-levels of methane pollution, in particular the San Juan Basin, which underlies a methane "hot spot." The EA also fails to take a hard look at the different short term and long-term warming impacts of methane. BLM fails to evaluate or disclose to the public the carbon dioxide equivalent of the increase in methane emissions under the Rescission Rule using the current, and best available, global warming potential values for methane of 36 (100-year) and 87 (20-year). Additionally, the EA, despite purporting to assess the effects of a nationwide rule, fails to take a hard look at the cumulative effects to the climate of increased methane emissions in combination with the BLM's nationwide federal public lands oil and gas program, including by failing to evaluate the magnitude or severity of the increased emissions and the emissions caused in total by BLM's nationwide federal public lands oil and gas program using existing tools such as the social cost of methane or carbon budgeting.

215. BLM also violated NEPA by impermissibly claiming, in a conclusory fashion, that BLM cannot consider the effects of climate change on public and tribal lands affected by the Rescission Rule. BLM did so despite the wealth of available qualitative and quantitative scientific data, information, and assessments regarding both current and reasonably foreseeable future impacts

Complaint for Declaratory and Injunctive Relief
Case No. 3:18-cv-5984                                                                                     45

in the western United States. Moreover, even if some information is unavailable, BLM failed to identify the relevance of the information, provide a summary of existing credible scientific evidence, or evaluate climate change impacts based upon generally accepted theoretical approaches or research methods. *See* 40 C.F.R. § 1502.22(b).

216. BLM also failed to take a hard look at the social cost of the Rescission Rule, despite the availability of a metric that allows it to do so: the Interagency Working Group's social cost of methane. BLM's reliance on the "interim" social cost of methane fails to consider significant domestic and global harms, arbitrarily undervalues the future effects of climate change, lacks professional and scientific integrity, ignores information from expert agencies, and underscores the significance, in particular the highly controversial nature, of its proposed action. By failing to consider the Interagency Working Group's social cost of methane, BLM improperly skewed its decision-making process, considering the Rescission Rule's monetized benefits in a vacuum, while discounting, if not entirely ignoring, the Rescission Rule's costs to the global and domestic environment.

217. BLM's failure to take a hard look at the Rescission Rule's environmental impacts fatally undermines the agency's conclusion, in the FONSI, that they will not be significant. The FONSI fails to provide a convincing statement of reasons justifying its decision to forego preparation of an EIS, which would have acknowledged the significance of the Rescission Rule's impacts to the environment while affording the agency the opportunity to prepare a comprehensive environmental review to ensure a reasoned and informed rulemaking. Under NEPA, BLM must prepare an EIS due to the Rescission Rule's significance in the global and national context and the extensive record evidence showing negative public health impacts, high degree of controversy, uncertainty surrounding the use of the social cost of methane, cumulative climate and public health impacts, and potential contribution to violations of federal ozone standards.

218. For these reasons, BLM's Rescission Rule and underlying EA and FONSI violate NEPA and are arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law, and without observance of procedure required by law. 5 U.S.C. §§ 706(2)(A), (C), (D).

**SIXTH CLAIM FOR RELIEF**
*(Failure to Define a Valid Purpose and Need and Consider a Reasonable Range of Alternatives: Violation of NEPA)*

219.   The allegations in paragraphs 1–168 are incorporated herein by reference.

220.   NEPA requires that an EIS or EA articulate a valid purpose and need for the proposed action under review. 40 C.F.R. §§ 1508.9(b), 1502.13.

221.   Consistent with the purpose and need, the agency must discuss "alternatives to the proposed action."  42 U.S.C. § 4332(2)(C) (EIS); *id.* § 4332(2)(E) (EA).  The range of alternatives is the "heart" of the NEPA analysis, "sharply defining the issues and providing a clear basis for choice among options by the decisionmaker and the public."  40 C.F.R. §§ 1502.14, 1508.9(b).

222.   Agencies must "[r]igorously explore and objectively evaluate all reasonable alternatives," and adequately explain and support its decision to eliminate consideration of particular alternatives.  *Id.* § 1502.14(a).

223.   In the Rescission Rule, BLM improperly subordinates its statutory duty to prevent waste beneath an unsupported desire to reduce agency and industry compliance burdens and costs. Indeed, BLM's own analysis shows that there is no need "to eliminate unnecessary regulatory requirements in order to more efficiently manage oil and gas operations on Federal and Indian Lands."

224.   Due to BLM's impermissibly narrow purpose and need, the agency failed to consider a range of reasonable alternatives.  In particular, BLM specifically failed to seriously consider reasonable alternatives, such as maintaining the Waste Prevention Rule (the no action alternative), action to strengthen the Waste Prevention Rule to provide even greater protections against waste of publicly owned natural resources whether identified independently or as recommended by the public, or to consider in detail certain reasonable (if modest) middle-ground alternatives BLM itself identified.  BLM failed to adequately explain or support its rejection of these reasonable and middle-ground alternatives.

225.   For these reasons, BLM's Rescission Rule and underlying EA and FONSI violate NEPA and are arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law, and without observance of procedure required by law.  5 U.S.C. §§ 706(2)(A), (C), (D).

Complaint for Declaratory and Injunctive Relief
Case No. 3:18-cv-5984                                                                                             47

**PRAYER FOR RELIEF**

Plaintiffs respectfully request that this Court:

1.      Issue a declaratory judgment that BLM violated the APA, Mineral Leasing Act, FLPMA, NEPA, and acted arbitrarily, capriciously, contrary to law, and in excess of statutory authority by issuing the Rescission Rule;

2.      Vacate the Rescission Rule and reinstate the Waste Prevention Rule in its entirety;

3.      Award the Conservation and Tribal Citizen Groups their costs, expenses, and reasonable attorney fees; and

4.      Provide such other relief as the Court deems just and proper.

Respectfully submitted this 28th day of September, 2018,

/s/ Stacey Geis
Stacey Geis, CA Bar # 181444
Earthjustice
50 California St., Suite 500,
San Francisco, CA  94111-4608
Phone: (415) 217-2000
Fax: (415) 217-2040
sgeis@earthjustice.org

Robin Cooley, CO Bar # 31168 (*pro hac vice pending*)
Joel Minor, CO Bar # 47822 (*pro hac vice pending*)
Earthjustice
633 17th Street, Suite 1600
Denver, CO 80202
Phone: (303) 623-9466
rcooley@earthjustice.org
jminor@earthjustice.org

*Attorneys for Plaintiffs Sierra Club, Fort Berthold Protectors of Water and Earth Rights, The Wilderness Society, and Western Organization of Resource Councils*

Susannah L. Weaver, DC Bar # 1023021 (*pro hac vice pending*)
Donahue, Goldberg, & Weaver LLP
1111 14th Street, NW, Suite 510A
Washington, DC 20005
Phone: (202) 569-3818
susannah@donahuegoldberg.com

Complaint for Declaratory and Injunctive Relief
Case No. 3:18-cv-5984                                                          48

Peter Zalzal, CO Bar # 42164 (*pro hac vice pending*)
Rosalie Winn, CA Bar # 305616
Environmental Defense Fund
2060 Broadway, Suite 300
Boulder, CO  80302
Phone: (303) 447-7214 (Mr. Zalzal)
Phone: (303) 447-7212 (Ms. Winn)
pzalzal@edf.org
rwinn@edf.org

Tomás Carbonell, DC Bar # 989797 (*pro hac vice pending*)
Environmental Defense Fund
1875 Connecticut Avenue, 6th Floor
Washington, D.C.  20009
Phone: (202) 572-3610
tcarbonell@edf.org

*Attorneys for Plaintiff Environmental Defense Fund*

Laura King, MT Bar # 13574 (*pro hac vice pending*)
Western Environmental Law Center
103 Reeder's Alley
Helena, MT 59601
Phone: (406) 204-4852
king@westernlaw.org

Erik Schlenker-Goodrich, NM Bar # 17875 (*pro hac vice pending*)
Western Environmental Law Center
208 Paseo del Pueblo Sur, #602
Taos, NM 87571
Phone: (575) 613-4197
eriksg@westernlaw.org

*Attorneys for Plaintiffs Los Padres ForestWatch, Center for Biological Diversity, Citizens for a Healthy Community, Diné Citizens Against Ruining Our Environment, Earthworks, Montana Environmental Information Center, National Wildlife Federation, San Juan Citizens Alliance, WildEarth Guardians, Wilderness Workshop, and Wyoming Outdoor Council*

Darin Schroeder, KY Bar # 93828 (*pro hac vice pending*)
Ann Brewster Weeks, MA Bar # 567998 (*pro hac vice pending*)
Clean Air Task Force
114 State Street, 6th Floor
Boston, MA 02109
Phone: (617) 624-0234
dschroeder@catf.us
aweeks@catf.us

Complaint for Declaratory and Injunctive Relief
Case No. 3:18-cv-5984                                                      49

*Attorneys for Plaintiff National Wildlife Federation*

Scott Strand, MN Bar # 0147151 (*pro hac vice pending*)
Environmental Law & Policy Center
60 S. 6th Street, Suite 2800
Minneapolis, MN 55402
Phone: (312) 673-6500
Sstrand@elpc.org

Rachel Granneman, IL Bar # 6312936 (*pro hac vice pending*)
Environmental Law & Policy Center
35 E. Wacker Drive, Suite 1600
Chicago, IL 60601
Phone: (312) 673-6500
rgranneman@elpc.org

*Attorneys for Plaintiff Environmental Law & Policy Center*

David Doniger, DC Bar # 305383 (*pro hac vice pending*)
Melissa Lynch, MA Bar # 689235 (*pro hac vice pending*)
Natural Resources Defense Council
1152 15th St. NW, Suite 300
Washington, DC 20005
Phone: (202) 289-6868
ddoniger@nrdc.org
llynch@nrdc.org

*Attorneys for Plaintiff Natural Resources Defense Council*

Complaint for Declaratory and Injunctive Relief
Case No. 3:18-cv-5984                                              50